# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ALFONSO SWANIGAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 15 C 6797 |
| | ) |
| SALEH OBAISI, ANN DAVIS, | ) |
| and WEXFORD HEALTH SOURCES, INC. | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Alfonso Swanigan, an inmate at Stateville Correctional Center, injured his head while exercising in the prison gymnasium. He initially experienced the symptoms that accompany a concussion, including headaches, nausea, and dizziness, and later began to experience neck pain as well. In the two and a half years that followed, prison doctors Saleh Obaisi and Ann Davis attempted a variety of treatments to relieve Swanigan's symptoms with inconsistent success. Swanigan alleges the failure to provide effective treatment shows deliberate indifference to his condition, a violation of the Eighth Amendment. He also alleges that Wexford Health maintains a policy or practice of deliberate indifference. The defendants[1] have moved for summary judgment.

## Background

Swanigan is an inmate at Stateville Correctional Center. On November 14, 2013,

---

[1] Donald Stalworthy and Tarry Williams were previously dismissed as defendants.

he suffered an injury while exercising. He was using a pull-down machine when he was injured. Pull-down machines are so named because a user pulls down on a bar that is connected to weights via a cable and pulley. The cable snapped, and Swanigan was struck in the head by the bar.

That day, doctors treated a small wound on Swanigan's head, administered a tetanus injection, and prescribed thirty Motrin pills. The next day, Dr. Saleh Obaisi prescribed a different pain reliever, Tramadol, for Swanigan's headaches. On November 18, Swanigan complained that he was feeling dizzy and that the headaches had not stopped. Dr. Obaisi conducted a neurological exam, which showed nothing abnormal. The doctor prescribed Atenolol, another painkiller, for Swanigan's headache and scheduled a follow-up appointment for the next day.

At that appointment, Dr. Ann Davis conducted another neurological exam, which again showed normal results. She ordered x-rays of Swanigan's head, which did not reveal anything abnormal. She ordered a "lay-in," a term that is not defined in the record but that appears to involve exempting Swanigan from ordinary prison activities, and provided him with ice. Dr. Davis scheduled another evaluation for November 21.

On November 20, however, Swanigan reported that he was feeling dizzy. Dr. Davis conducted both a physical and neurological exam, with normal results. She continued the lay-in and scheduled a follow-up appointment. Before that appointment, Swanigan returned to report that he had fainted. As a result, Dr. Obaisi sent Swanigan to the local hospital. There, Swanigan underwent CT and x-ray imaging. Neither revealed anything abnormal. The emergency room doctor diagnosed Swanigan with post-concussion syndrome. The doctor recommended prescribing Tylenol for pain relief

and Zofran for nausea. Dr. Obaisi issued these prescriptions. In a declaration submitted along with defendants' motion for summary judgment, Dr. Obaisi stated that there is no cure for post-concussion syndrome and that the only treatments available are employed to ease symptoms. Obaisi Decl. at 3, ¶ 7.

On November 25, Swanigan had a scheduled appointment with Dr. Davis. It was rescheduled to November 27. At that appointment, he complained that his headache and dizziness had continued. Dr. Obaisi admitted Swanigan into the infirmary for monitoring. The next day, Swanigan told the attending nurses that he was no longer experiencing any headache, dizziness, or nausea. He was discharged from the infirmary.

On December 16, Swanigan filed a grievance with the prison regarding his course of treatment. On December 24, he reported his dizziness and headaches had returned. Dr. Davis decided to change the course of treatment by treating Swanigan's headaches like migraines: she prescribed propranolol and Excedrin, the sixth and seventh revisions to Swanigan's medication regime. A subsequent appointment on February 1, 2014 was cancelled due to inadequate staffing but was rescheduled for February 10, during which Swanigan reported no change in his headaches.

On April 4, 2014—about six months after the original injury—Swanigan attended a check-up with Dr. Obaisi, in which he told the doctor that he only occasionally needed the Excedrin to treat his headaches. Dr. Obaisi scheduled a follow-up appointment. At that appointment, Swanigan reported that the headaches returned and that he was experiencing occasional dizziness and stiffness in his neck. To evaluate the stiffness in Swanigan's neck, Dr. Obaisi ordered an x-ray scan and laboratory tests. Both tests

failed to show any abnormalities. To address Swanigan's headache, Dr. Obaisi prescribed a new medication, Verapamil.

Swanigan reported stiffness of the neck again on July 8. Dr. Obaisi decided to prescribe Robaxin and physical therapy as a new course of treatment. Swanigan completed three months of physical therapy.

At a February 4, 2015 medical appointment, originally scheduled for January 3, he said he was again experiencing headaches, as well as a feeling of weakness. Dr. Obaisi believed the sensation to be a byproduct of Swanigan's medication. Dr. Obaisi reduced the dose and added another medication, Tegretol, to aid with headaches. Dr. Obaisi ordered a follow-up appointment. At that appointment, Swanigan reported feeling more energy and having fewer headaches.

Swanigan began exercising again, which prompted the return of some of his symptoms. On May 12, 2015, Swanigan reported neck pain. Dr. Obaisi ordered a steroid injection to treat the pain, which was administered the next day. Swanigan complained of additional neck pain on May 27. The doctor referred him for additional physical therapy, which began on August 6. In August and September 2015, Swanigan underwent physical therapy to treat his neck pain.

During a November 2015 follow-up appointment with Dr. Obaisi, Swanigan reported that his condition had not changed. Dr. Obaisi ordered another x-ray. The x-ray revealed early degenerative joint disease in the C4, C5, and C6 vertebrae of the cervical spine.

By February 3, 2016, Swanigan's neck pain had not yet ceased. Dr. Obaisi prescribed Baclofen, a new medication, and scheduled a follow-up appointment. At that

appointment, Swanigan stated that beta blockers and muscle relaxants had worked well in the past. Dr. Obaisi prescribed Atenolol, a beta blocker, and Robaxin, a muscle relaxant. Based on the Court's review of the parties' Local Rule 56.1 statements, this was the thirteenth change in Swanigan's medications.

In his amended complaint, Swanigan asserts claims against Dr. Obaisi and Dr. Davis and against Wexford Health, a corporation contracted to provide medical care at Stateville and other Illinois prisons. In Count 1, Swanigan alleges that the doctors violated his Eighth Amendment rights by demonstrating deliberate indifference towards his condition. He also alleges that Wexford Health maintained a policy or practice of deliberate indifference. In Count 2, he claimed that the individual defendants failed to intervene in the alleged unconstitutional conduct of the other defendants.

**Discussion**

The defendants have moved for summary judgment on Swanigan's claims. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party makes a showing sufficient to avoid summary judgment by presenting "evidence . . . such that a reasonable jury could return a verdict for the . . . party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must "construe all facts and reasonable inferences in favor of the nonmoving party." *Omnicare, Inc. v.*

5

*UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011).

Swanigan's claims arise under the Eighth Amendment. The prohibition on cruel and unusual punishment requires states to provide adequate medical care to inmates. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002). To succeed on a claim under the Eighth Amendment, Swanigan must first show that he possesses a serious medical condition. *Gamble*, 429 U.S. at 106; *Boyce*, 314 F.3d at 889. The defendants do not contest that Swanigan's symptoms were objectively serious.

Next, Swanigan must show that the defendants acted with deliberate indifference to his condition. *Gamble*, 429 U.S. at 106; *Boyce*, 314 F.3d at 889. For the individual defendants, Swanigan must show that the doctors actually knew of his condition and chose to disregard it. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). For Wexford Health, a private corporation, Swanigan must show, directly or inferentially, that it had a policy, practice, or custom of deliberate indifference that caused him injury. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789, 796 (7th Cir. 2014).

The first issue before the Court is whether Swanigan has presented sufficient evidence to permit a reasonable jury to find that Dr. Obaisi or Dr. Davis was deliberately indifferent to his post-concussive symptoms and neck pain. Swanigan has no direct evidence of either doctor's indifference, but that is not required. *See Petties*, 836 F.3d at 728. In *Petties*, the Seventh Circuit listed several circumstances that could indicate a medical official behaved with deliberate indifference, three of which are relevant in this case: (1) a decision to ignore the prisoner's request for aid, (2) persisting in an approach to treatment that the doctor knows to be ineffective, or (3) an inexplicable

6

delay in treatment. *Id.* at 728-31. Swanigan has not presented evidence that would permit a reasonable jury to find that any of these circumstances apply.

First, nothing in the record suggests that the doctors ignored any of Swanigan's requests for aid. *Id.* at 729. Swanigan indicates that some of his appointments were rescheduled over the course of the two and a half years in which he was treated. *See, e.g.,* Pl.'s Resp. Mot. Summ. J., Ex. A (Medical Recs.) at 43, 56 (medical records indicating a rescheduled appointment). But given the number of medical visits he had and the extent of the treatment he received, no reasonable jury would conclude that a few missed appointments is indicative that either doctor was ignoring or avoiding him.

Second, Swanigan has not provided evidence that would permit a reasonable jury to find that either doctor persisted in an approach to treatment she knew was ineffective. *Petties*, 836 F.3d at 729-30. When faced with ongoing symptoms, Swanigan's doctors set out on a thorough diagnostic process, conducting physical and neurologic exams and ordering x-ray and CT scans, to attempt to understand the cause of the symptoms. *See, e.g.,* Medical Recs. at 144-45 (diagnostic imaging report following CT and x-ray scans). The doctors changed treatments repeatedly to address new or persistent symptoms, including prescribing over a dozen different medications. *See, e.g., id.* at 52 (prescription for propranolol and Excedrin to replace the previous unsuccessful medication). No reasonable jury could look at Swanigan's lengthy medical record and conclude that the doctors persisted with any treatment that was obviously ineffective.

Finally, Swanigan has not provided evidence that would permit a finding that he experienced any inexplicable delay in treatment. *Petties*, 836 F.3d at 730. To prevail

on an argument that a delay in treatment has violated the Eighth Amendment, a prisoner must show that the delay exacerbated or prolonged his adverse condition. *Id.* at 730-31. The rescheduled appointments that Swanigan points to are nothing like the delays that courts have found to violate the Eighth Amendment. *See, e.g., Arnett v. Webster*, 658 F.3d 742, 752-53 (7th Cir. 2011) (finding that a ten-month delay in providing medication to treat rheumatoid arthritis, causing pain and irreversible damage and deformity, was sufficient to state an Eighth Amendment claim). Rather, the rescheduled appointments are the type of occurrence "common in [a] prison setting with limited resources." *Petties*, 836 F.3d at 730.

Arguably more troubling is the two-month delay between Dr. Obaisi's recommendation for physical therapy on May 27, Medical Recs. at 105, and the beginning of therapy on August 6. *Id.* at 108. Swanigan does not, however, offer any evidence that this delay "exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730-31. He had been prescribed physical therapy before, during which his condition improved, but he continued to experience pain during the therapy. Medical Recs. at 81. Similarly, Swanigan stated that he continued to "notic[e] pain in the back of [his] neck" as he went through the second round of physical therapy. Swanigan Dep. at 149. Moreover, approximately two months after the physical therapy finished in September 2015, Swanigan told doctors he was still suffering from a stiff neck. Medical Recs. at 123. There is no evidence suggesting that his neck pain or any other symptom was either exacerbated or prolonged by the delay in receiving physical therapy.

It is apparent from the record that that Swanigan's search for relief from his pain

8

and other symptoms has been long and difficult. But that does not, without more, reflect deliberate indifference by either Dr. Obaisi or Dr. Davis. And as discussed above, Swanigan has not offered any other evidence that would permit a reasonable jury to find that either of the doctors provided constitutionally inadequate treatment. Both Dr. Obaisi and Dr. Davis are entitled to summary judgment.

Wexford Health is also entitled to summary judgment. To survive summary judgment, Swanigan must provide evidence sufficient to permit a reasonable jury to find that Wexford Health employed a "policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Shields*, 746 F.3d at 796. Swanigan has offered no evidence that his cancelled or rescheduled appointments are the result of any policy at all, much less a policy of deliberate indifference. Instead, on the record before the Court, the rescheduled appointments are the sort of "isolated incidents" that are insufficient to establish a custom or policy. *Id.* In this regard, the Court notes that it is not even clear from the record that Wexford Health, rather than the prison administration, controls the times during which Wexford may provide services at the prison.

Finally, in Count 2, Swanigan asserts a failure-to-intervene claim. A defendant may be liable for failure to intervene if she (1) had reason to know of a constitutional violation committed by another official and (2) had a realistic opportunity to intervene to prevent the harm from occurring. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). The defendants are entitled to summary judgment on this claim, as Swanigan cannot show an underlying constitutional violation.

## Conclusion[2]

For the foregoing reasons, the Court grants defendants' motion for summary judgment [dkt. no. 88] and directs the Clerk to enter judgment in favor of defendants.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: November 6, 2017

---

[2] The Court thanks Daniel Mohan and Vy'Shaey Mitchell of Daley Mohan Groble PC, for their service as appointed counsel for Mr. Swanigan.